## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WISCONSIN

In Re:

Quantum Leap Restaurants, Inc.;                    Case No.:
Sioux Restaurants, LLC,                            Case No.:

                                                   Chapter 11
                          Debtors.                 Joint Administration Pending

## AFFIDAVIT AND DECLARATION OF THOMAS G. LARSON IN SUPPORT OF FIRST-DAY MOTIONS

I, Thomas G. Larson, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am an adult resident of the State of Wisconsin and the President and sole shareholder of Quantum Leap Restaurants, Inc. (the "Corporation").

2.      The Corporation is the sole member of Sioux Restaurants, LLC ("Sioux" and collectively with the Corporation, "Debtors").  I have been associated with the Corporation since 1997 and with Sioux since 2006, when Sioux was founded.

3.      As a result of my active involvement in with the Debtors, I am familiar with their day-to-day operations, business affairs, books, and records all of which are maintained in the ordinary course of business (the "Business Records") by me and my staff.  Accordingly, except as otherwise indicated, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the employees of Larson Management, Inc. ("LMI"), the Debtors' professional

management company. If called as a witness, I would testify competently to the facts set forth herein.

4.        I am authorized to submit this Affidavit and Declaration (the "Larson Declaration") on behalf of the Debtors in support of the Debtors' voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") and the relief requested in the Debtors' various "first-day" applications and motions (the "First-Day Motions").

5.        Even if not specifically restated in this Affidavit, I have reviewed the First-Day Motions and the facts stated therein are true and correct to the best of my knowledge.

## I.    Background

6.        On October 17, 2013 (the "Petition Date"), the Debtors filed their Petitions for protection pursuant to Chapter 11 of Title 11 of the United States Code.

7.        Debtors are continuing in possession of their property and operating and managing their businesses pursuant to §§ 1107 and 1108 of the U.S. Bankruptcy Code (the "Bankruptcy Code").

8.        The lead Debtor, Quantum Leap Restaurants, Inc., is a Wisconsin corporation headquartered in Eau Claire, Wisconsin.  The other Debtor, Sioux Restaurants, LLC, is a Wisconsin limited liability company and is a wholly owned subsidiary of the Corporation. The Corporation is the sole member of Sioux.  I am the sole shareholder of the Corporation.

9.        The Corporation leases and operates six (6) TGI Friday's™ restaurants in Wisconsin, located in Madison, Middleton, Onalaska, Greenfield, Brookfield, and Appleton.  Sioux leases, is the franchisee for, and holds the licenses for food and

alcohol at two TGI Friday's™ restaurants, one in Fargo, North Dakota, and the other in Rapid City, South Dakota.

10.     Debtors use a combined cash management system.  All revenue from the Corporation's restaurants and Sioux's restaurants are deposited into accounts in the name of the Corporation.  The bank accounts are held at US Bank and Peoples State Bank, all located in Eau Claire, Wisconsin.  The Corporation employs all employees at both its and Sioux's restaurants, a total of approximately 650 employees.

11.     The Debtors' assets consist primarily of franchise agreements, commercial and ground leases, equipment, restaurant furnishings, inventory, cash, and accounts receivables.  Debtors do not own any real estate.

12.     On the Petition Date, Debtors were liable to GE Capital Franchise Finance Corporation ("GE") as follows:

      a.     The Corporation was originally liable to GE, pursuant to four loan agreements dated November 9, 2006, in the total original principal amount of approximately $6.015 million.  On the Petition Date, the total owed to GE by the Corporation was approximately $3.420 million.  In addition, the Corporation guaranteed the obligations of Sioux and other non-debtor subsidiaries to GE.

      b.     Sioux was originally liable to GE pursuant to two notes dated November 9, 2006 in the total original principal amount of $2.591 million.  On the Petition Date, the total owed to GE by Sioux was

approximately $1.46 million.  In addition, Sioux guaranteed the debt of the Corporation.

c.  The Corporation was originally liable to Peoples State Bank of Wisconsin (the "Bank"), pursuant to a line of credit dated October 29, 2012.  On the Petition Date, the total owed to the Bank by the Corporation was approximately $557,878.

13.  GE claims a security interest in substantially all of the Debtors' assets pursuant to various security agreements, mortgages of leasehold interest and assignments of rents.  GE is the Debtor's primary secured creditor.

14.  In addition, Peoples Bank filed a UCC-1 Financing Statement with regard to the assets of the Corporation on November 11, 2012.  Peoples Bank is subordinate to GE and is completely unsecured as to the Debtors' assets.

15.  In addition to the creditors already noted above, Debtors are indebted to Carlson, Inc. ("Carlson"), their franchisor, pursuant to the eight TGI Friday's™ Franchise Agreements related to the Debtors' restaurants (the "Franchise Agreements").  On the Petition Date, Debtors were indebted to Carlson in the amount of approximately $612,178 for past due payments pursuant to the various Franchise Agreements.

16.  The Debtors started experiencing cash flow problems in 2007 and 2008 as a result of the general recession that began in those years.  These cash flow problems required capital injections by me over the ensuing years, but even today the working capital of the Debtors is impaired due to the very slow economic recovery and significant legacy costs related to closed restaurants.  Until some less than

profitable restaurants were closed, Debtors' cash flow problems were exacerbated because healthy restaurants were required to support the debts associated with economically unhealthy restaurants.

17.     Since 2012, the Corporation and various subsidiaries have closed four poorly performing restaurants.  However, prior to the Petition Date, the Corporation was continuing to pay the legacy obligations of these "dark" stores.  Further, Debtors have struggled with the weight of their debt payments, a sluggish economic recovery in the casual restaurant industry, and increased advertising costs.

18.     By restructuring their secured debt, freeing themselves of costs associated with closed stores and taking advantage of continued economic recovery, Debtors intend to successfully reorganize through Chapter 11.

## II.     First Day Motions

19.     In furtherance of the Debtors' objectives to restructure, the Debtors will file a number of First-Day Motions and will propose orders (such orders being referred to herein as the "First-Day Orders").  I have reviewed each of the First-Day Motions, and the facts set forth therein are true and correct to the best of my knowledge, information, and belief, based upon my personal knowledge or the knowledge gained of such matters from the Debtors' and/or LMI's employees or retained advisors.  Moreover, I believe that the relief sought in each of the First-Day Motions and First-Day Orders: (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their businesses or loss of productivity or value; and, (b) constitutes a critical element in achieving the Debtors' successful reorganization and recapitalization.

      ii.    **Motion To Approve Agreed Interim Order Pursuant to Sections 105(a), 362 and 363 of the Bankruptcy Code Authorizing Use of Cash Collateral and Granting Relief**

20.    Debtors will need to use operating funds to operate.  The Debtors have virtually no cash with which to operate that is not collateral of its secured creditors, primarily GE.  In fact, Debtors believe that all of their assets, including inventory and accounts receivable, have been pledged to their pre-petition lenders.

21.    If the Debtors are unable to obtain the right to use cash collateral and grant adequate protection to their pre-petition secured lenders, they will be unable to function and they will then have no alternative but to cease operations.  Debtors need to pay vendors this week for food and alcohol deliveries and the Debtors' combined payroll is due October 21, 2013.  The Debtors must pay their payroll or their hourly workers, most of whom live paycheck to paycheck, will not show up for work.  In short, if Debtors cannot make the payroll payments, they will close their doors.

22.    I have reviewed the budget submitted with the Cash Collateral Motion. I believe that it is reasonable and will allow Debtors to maintain current operations.

      ii.    **Motion to Authorize Payment of Pre-Petition Employee Wages (the "Employee Motion")**

23.    The Corporation employs all of the employees who work at the Debtors' location.  In total, the Corporation employs approximately 650 people in Wisconsin, North Dakota and South Dakota at eight different locations.

24.    Prior to filing its Chapter 11 cases, the Corporation was paying its employees regularly.  The Debtors filed their chapter 11 petitions in the middle of the Corporation's regular and customary salary and hourly wage payroll cycle. Employees are owed salary and wages for employment services performed prior to

the Petition Date, but are due to be paid after the Petition Date.  The Corporation must meet all payroll obligations to continue operating.  Without paying payroll, the employees will not work and Debtors cannot operate.

### iii.    Motion for Utility Procedures

25.    The Corporation pays for utility services for gas, electricity, cable and telephones at the eight remaining locations.  Debtors must continue to use these utility services to keep the doors open and continue operating.  The Debtors are current on payment for all such services received and billed by the Utilities pre-petition.  Utility providers are owed sums for services provided prior to filing that have not yet been billed but are due to be billed and paid after filing.

26.    Significant delay in paying utility bills will disrupt Debtors' relationships with the Utilities and their ability to conduct business.  Failure to pay current invoices may also require Debtors to submit costly utility deposits.  Thus, a delay in paying such bills would undermine the success of this reorganization and impair the Debtors' going concern value.

27.    In addition, to avoid business disruption and meet the requirements of the Bankruptcy Code, Debtors are seeking the approval of a procedure to provide adequate assurance of payment.

### iv.    Motion to Honor Customer Obligations

28.    The Debtors regularly honor gift cards within the TGI Friday's™ chain of restaurants.  Allowing the Debtors to accept gift cards from these customers will preserve the value of the Debtors' business and will not impair the creditors' rights.

### v.    Motion to Authorize Shortened Service List

29.    There are at least one thousand (1,000) creditors statutorily entitled to Notice in this case.  Providing service of every motion to all creditors would be impractical and unreasonably costly.

### vi.    Motion for Joint Administration

30.    The Corporation is the sole member of Sioux.  The Corporation is the entity that owes money to most of the vendors that provide goods and services to the Sioux locations, including Utilities, and employs the employees who work at the Sioux restaurants.  For the reasons stated in the Motion, joint administration of these cases is appropriate and the Debtors are requesting it on a first day basis.

### vii.    Motion to Continue Cash Management System

31.    The Debtors seek to minimize disruption to their business operations by maintaining their existing cash management systems.  Particularly because credit card payments make up 85% of the Debtors' revenue, a change in banking arrangements will require resetting the credit card processing and deposits.  Any delay caused by not preserving the existing cash management systems, even for a couple of days, would severely impair the Debtors' ability to operate.

### viii.    Motion to Extend Time to File Schedules and Statement of Financial Affairs

32.    Due to the complexity of the Debtors' operations, and for the reasons stated in the Motion, seeking additional time to file schedules, the relief requested is appropriate.  The Debtors' staff and that of LMI have been focused on dealing with creditor and landlord issues, and have not had additional time to provide the detailed information needed to complete the Schedules and Statement of Financial Affairs

accurately.  With the automatic stay in place, staff will be freed up to compile and transmit that data to counsel for completion of Schedules.

### ix.    Limiting Notice

33.    The Debtors also request that this Court enter an order allowing the Debtors to Limit Notice on the aforementioned Motions.

34.    The Debtors request that they be allowed to Limit Notice to the Secured Creditors, the United States Trustee, and as many of the 20 largest Unsecured Creditors as the Debtor can locate via facsimile or email, the lessors, the franchisor, the utilities, and all taxing authorities.

35.    Attempting to locate and give Notice to all of the Debtors' creditors would be unreasonably difficult and expensive.

36.    I declare under penalty of perjury that the foregoing is true and correct.

_____

Thomas Larson

Subscribed and sworn to before me this
___ day of October, 2013.

Print Name: Megan E Lindblad
Notary Public, State of Wisconsin
My Commission: 11/20/16